John Heenan
HEENAN LAW FIRM, PLLC
Downtown Post Office Bldg.
P.O. Box 2278
Billings, MT 59103
(406) 839-9091 (phone)
(406) 839-9092 (fax)
john@heenanlawfirm.com

Neel Hammond
HAMMOND LAW, P.L.L.C.
P.O. Box 9155
234 E. Pine Street
Missoula, MT  59807-9155
Telephone:  (406) 543-2494
Fax:  (406) 728-8445
neel@hammondlawpllc.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| GLEN RAY GALLIER and JANN GALLIER, <br><br> Plaintiffs, <br><br> -vs- <br><br> SOUTHWESTERN REGIONAL MEDICAL CENTER, INC. d/b/a CANCER TREATMENT CENTERS OF AMERICA, <br><br> Defendant. | Cause No. CV-09-34-BU-RFC <br><br><br> **COMPLAINT AND JURY DEMAND** |

COMES NOW Plaintiffs, Glen Ray Gallier and Jann Gallier, by and through their attorneys of record, and for their Complaint against Defendant, allege as follows:

## INTRODUCTION

Defendant advertises nationally, through aggressive television marketing, its ability to cure even the most deadly and untreatable forms of cancer. Defendant provided costly and dangerous chemotherapy and cancer treatment to Mr. Gallier over the course of months before Mr. Gallier learned, after receiving a second opinion from a local Montana provider, that he did not, in fact, even have cancer. Defendant brings this action for Defendant's professional malpractice as well as to enforce his rights as a consumer of medical services under the Montana Consumer Protection Act.

## THE PARTIES

1. At all times referenced hereinafter, Plaintiffs Glen and Jann Gallier, were and are residents and citizens of Bozeman, Gallatin County, Montana.

2. At all times at issue in the following claims, Defendant, Southwestern Regional Medical Center, Inc. d/b/a Cancer Treatment Center of

America (hereafter "CTCA") was an Oklahoma corporation with corporate headquarters at 10109 E 79th St, Tulsa, OK 74133-4564.

3. Defendant CTCA solicited Glen Gallier as a patient through targeted television advertising in Montana which Mr. Gallier viewed at his home in Bozeman, Montana.

## JURISDICTION

4. This Montana Federal Court has diversity subject matter jurisdiction pursuant to 28 USCA § 1332.

5. CTCA has purposely availed itself of the Montana medical marketplace by, without limitation, placing commercial ads on Montana television and by corresponding with Montana health care providers in directing the care and treatment of Glen Gallier in Oklahoma and in Montana. It is foreseeable that suits would be brought against Defendant by Montana patients. Further, the interest of a Montana medical consumer is at issue here. This Court has personal jurisdiction over Defendant and such jurisdiction comports with the restrictions of the Due Process Clause of the XIV Amendment to the U.S. Constitution.

## VENUE

6.     A majority of Defendant's breaches of duty and violations of Montana law enumerated below occurred, directly or indirectly, in Montana. Pursuant to 28 USCA § 1391(a)(2), venue is proper in this Montana Federal Court where "a substantial part of the events or omissions giving rise to the claim occurred."

## FACTS COMMON TO ALL CLAIMS

7.     In July 2006, Glen Gallier's physicians in Bozeman, Montana, performed a computerized tomography (CT) scan of his abdomen which showed unexplained nodules in his liver.  A needle biopsy on September 18, 2006 showed inflammatory changes in Glen's liver consistent with hepatitis and cirrhosis without evidence of cancer.

8.     Glen gave a history of Hepatitis C, contracted in the military service, and a past history of alcoholism.

9.     On December 20, 2007, Dr. Annie Castillo saw and evaluated Glen Gallier for the first time.  Dr. Castillo concluded from the literature[1] and Glen's lab work, exam, and CT scans at that time that he had hepatocellular carcinoma and required chemotherapy.

10. Dr. Castillo decided not to biopsy Glen's liver because the published Guidelines do not require such a biopsy when the alpha-feto protein (AFP) is greater than 200 and the liver nodules are larger than 2 cm.[2] Glen Gallier's AFP was over 9,000 and his liver nodules were in excess of 3 cm in January 2008.

11. After obtaining informed consent, on January 17, 2008, Dr. Castillo started an oral chemotherapy agent called Nexavar at a dose level of 400 mg twice daily. She explained to him that this was not curative therapy and that he was not eligible for a liver transplant or surgical resection of the liver nodules.

12. Glen had been diagnosed with a disease which he knew was going to kill him. He was desperate. He looked at the possibility of treatment in Billings under a study protocol of the National Cancer Institute; but when he saw the polished television ad and website of CTCA and the enthusiastic testimonials of presumably cured cancer patients, he was sold on CTCA for the medical services he needed.

13. Dr. Castillo continued to use Nexavar; however Glen tolerated the

---

[1] Dr. Castillo references American Association of Study of Liver Disease Guidelines
[2] See http://www.aasld.org/practiceguidelines/Pages/EndStageLiverDiseaseSurgery.aspx

drug poorly and doses had to be reduced and treatments delayed.  Nevertheless, Glen's AFP, *the only pure blood borne marker for cancer activity*, precipitously dropped to 846 on January 28, 392 on February 4, and to 50 by March 3, 2008.  Further, Glen's physical examination noted his liver margin to have shrunk from 8 cm (>3inches) below his rib margin on his right side to no liver margin felt.

14. Dr. Castillo struggled with Glen's side effects, adjusting doses and delaying treatments, but continued Nexavar, which seemed to be working dramatically.

15. On March 12, 2008, seeking the amazing results advertised on CTCA's television ads, Glen Gallier transferred his care to CTCA's regional medical center in Tulsa, Oklahoma.  He was having chemotherapy side effects from the Nexavar and CTCA's advertisements promised him results which sounded almost too good to be true.

16. On his March 12 visit, Glen Gallier saw CTCA Dr. Leon J. Yoder.  Considering Glen's case, including his AFP of 48.5 and his "minimal" liver enlargement at the time, Dr. Yoder opined: *"I am not sure of the diagnosis of HCC [hepatocellular carcinoma] since no tissue was ever obtained."*  *"I feel*

*strongly that he should have a liver biopsy for definite confirmation and then definitive plans can be made for his treatment."*

17. Two days later, on March 14, 2008, CTCA Dr. Simeon Jaggernauth started chemotherapy with a toxic and expensive regimen which included Gemcitabine, Oxaliplatin, and Neulasta. Dr. Jaggernauth was at all times relevant hereto acting in the course and scope of his employment at CTCA. Dr. Jaggernauth did not obtain the requested biopsy of the liver because, in his words, "he does not want to undergo this procedure". No expression of "against medical advice" or informing Glen of Dr. Yoder's uncertainty of diagnosis is recorded on the medical record. Nexavar was listed under "allergies" for the first time in March 2008.

18. Dr. Jaggernauth administered a second cycle of chemotherapy on March 28, 2008 in Tulsa. At Glen's request, three subsequent treatments with this regimen were carried out in Bozeman, Montana at the express direction of CTCA.

19. In July 2008, Glen again sought care with Dr. Thomas Purcell at the Billings Clinic. As a pre-treatment requirement for toxic therapy, Dr. Purcell ordered the biopsy which Dr. Yoder had urged back in March 2008. On

August 5, 2008, three CT-directed needle biopsies of Glen's liver nodules, carried out in Billings, Montana, revealed inflammation and cirrhosis, but *no cancer whatsoever.*

20. As a result of the chemotherapy given and recommended by Defendant, Glen Gallier has suffered harm in the form of acute and known long-term side effects of the chemotherapy agents, substantial medical costs for un-needed chemotherapy, unwarranted pain and suffering, and emotional distress. His wife Jann has suffered loss of comfort and companionship, as well as emotional distress in her own right, thinking for almost a year her husband was dying from cancer.

## COUNT I – DEVIATION FROM STANDARD OF CARE

21. Plaintiffs re-allege ¶¶ 1-20 above.

22. In providing medical care to Glen Gallier, CTCA, by and through Dr. Jaggernauth and others, was negligent, and provided such services below safe and prudent standards of cancer care for health care providers and licensed health care institutions, including without limitation, the following:

    a. Failing to verify cancer in a patient without any other criteria allowing the reasonable assumption of cancer;

b. Failing to fully and completely evaluate the efficacy of prior chemotherapy before proceeding with toxic, expensive, potentially fatal chemotherapy;

c. Failing to adequately consider other FDA-approved regimens;

d. Failing to obtain adequate consent for unproven, off-label, non-protocol-approved therapy; and

e. Misleading Glen Gallier as to the expected results of treatment.

## COUNT II -- CAUSATION

23. Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-22.

24. The acts and omissions of CTCA:

a. Exposed Glen Gallier to the toxicities, both short and long term, of an alkylating agent (Oxaliplatin) and an antimetabolite (Gemcitabine);

b. Deprived Glen Gallier of months of productive life;

c. To a medical probability, deprived Glen Gallier of his expected years of survival; and

d. Caused considerable and ongoing mental anguish to the Plaintiffs by creating the unfounded and false understanding that Glen had terminal cancer, though his course was recognized as aberrant by Dr. Yoder and,

subsequently, by Dr. Purcell.

## **COUNT III – DAMAGES**

25. Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-24.

26. Plaintiffs have sustained damages from the negligence of CTCA, without limitation, as follows:

   a. Exorbitant medical bills/costs;

   b. Short and long term toxicity from potentially fatal chemotherapy, given for non-existent cancer;

   c. Mental anguish from the drug toxicity and the unwarranted assumption of continued cancer;

   d. Interruption of an established course of personal and family life;

   e. Loss of spousal consortium;

   f. Wage loss;

   g. Exorbitant medical costs; and

   h. The infliction of emotional distress upon Glen, Jann and all of his family and friends who watched helplessly as he was given discouraging news about his improved status and was given unnecessary toxic combination chemotherapy.

## COUNT IV – CONSUMER PROTECTION ACT VIOLATIONS

27.     Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-26.

28.     Plaintiffs were consumers pursuant to the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101 et. seq. at all times relevant hereto.

29.     Defendant CTCA engaged in unfair or deceptive acts or practices in the conduct of its commerce or trade through its unfair and deceptive conduct in promising to cure Plaintiff Glen Gallier of cancer he never even had and in charging grossly exorbitant sums for medical treatment which he did not need and/or which is not customary or necessary medical services.

30.     Plaintiffs have suffered and continue to suffer damages as a result of Defendant's unfair and deceptive acts and conduct.

31.     Plaintiffs are entitled to recover all compensatory and actual damages (including, but not limited to emotional distress damages), as well as treble damages, costs and attorney's fees as provided by the Montana Consumer Protection Act.

WHEREFORE, having stated a claim for relief, Plaintiffs request the following remedies and relief:

1. For judgment in Plaintiffs' favor.

2. Interest on sums awarded.

3. For cost of suit as allowed by law.

4. For any and all compensatory damages.

5. For any and all penalties imposed by law, including but not limited to treble damages and attorney's fees under the Montana Consumer Protection Act.

6. For any and all additional relief which may be appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all triable issues.

DATED this 4th day of May, 2009.

>Heenan Law Firm, PLLC
>Hammond Law, PLLC
>
>
>By */s/ John Heenan*
>   JOHN HEENAN
>   NEEL HAMMOND