John Heenan
Mandi Gibbs
HEENAN LAW FIRM
3970 Avenue D, Suite A
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile:  (406) 839-9092
john@heenanlawfirm.com
mandi@heenanlawfirm.com

Neel Hammond
HAMMOND LAW, P.L.L.C
P.O. Box 9155
234 E. Pine Street
Missoula, MT 59807-9155
Telephone: (406) 543-2494
Fax: (406) 728-8445
neel@hammondlawpllc.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| GLEN GALLIER and JANN GALLIER, | Cause No. CV-09-34-BU-RFC |
| Plaintiffs, | |
| vs. | **AMENDED COMPLAINT AND JURY DEMAND** |
| SOUTHWESTERN REGIONAL MEDICAL CENTER, INC. d/b/a CANCER TREATMENT CENTERS OF AMERICA. | |
| Defendant. | |

Comes now Plaintiffs, Glen Ray Gallier and Jann Gallier, by and through their attorneys of record, and for their Complaint against Defendants allege as follows:

## INTRODUCTION

Defendants, Southwestern Regional Medical Center, Inc. ("Southwestern") and Cancer Treatment Centers of America, Inc. ("CTCA") advertise nationally, through aggressive television internet and print marketing, their ability to cure even the most deadly and untreatable forms of cancer. Defendant Southwestern provided costly and dangerous chemotherapy and cancer treatment to Mr. Gallier over the course of months before Mr. Gallier learned, after receiving a second opinion from a local Montana provider, that he did not, in fact, even have cancer. Plaintiffs bring this action for Defendant Southwestern's professional malpractice, CTCA's unauthorized and negligent practice of medicine, as well as to enforce his rights as a selected, vulnerable, and cancer-stricken consumer of medical services under the Montana Consumer Protection Action.

## THE PARTIES

1.     At all times referenced hereinafter, Plaintiffs Glen and Jann Gallier, were and are residents and citizens of Bozeman, Gallatin County, Montana.

2.     At all times at issue in the following claims, Defendant Southwestern was an Oklahoma corporation with corporate headquarters at 10109 E. 79th St.

Tulsa, OK 74133-4564.

3.      At all times at issue in the following claims, Defendant CTCA was an Illinois Corporation with corporate headquarters at 1336 Basswood Road, Schaumburg, IL 60173.

4.      Defendants solicited Glen Gallier as a patient through targeted television advertising, phone contact, and an internet site which included testimonials of Montanans in Montana, as Mr. Gallier viewed and heard this at his home in Bozeman, Montana.

## JURISDICTION

5.      This Montana Federal Court has diversity subject matter jurisdiction pursuant to 28 USCA §1332.

6.      Southwestern has purposely availed itself of the Montana medical marketplace by, without limitation, placing commercial ads on Montana television, and by corresponding with Montana health care providers in directing the specific care and treatment of Glen Gallier in Oklahoma and in Montana.  It is foreseeable that suits would be brought against Defendant by Montana patients.  Further, the interest of a Montana medical consumer is at issue here.  This Court has personal jurisdiction over Defendant and such jurisdiction comports with the restrictions of the Due Process Clause of the XIV Amendment to the U.S. Constitution.

7.      CTCA   has   purposely   availed   itself   of   the   Montana   medical

marketplace by, without limitation, placing commercial ads on Montana television and communicating directly with Glen Gallier through its Oncology Information Specialists using CTCA's website "click to chat" option and CTCA's Oncology Information specialist, Jessica Carlson, calling Glenn Gallier directly at his home in Bozeman, Montana, and continuing to follow him at the co-Defendant, Southwestern's hospital facility.   It is foreseeable that suits would be brought against Defendant by Montana patients.  Further, the interest of a Montana medical consumer is at issue here.  This Court has personal jurisdiction over Defendant and such jurisdiction comports with the restrictions of the Due Process Clause of the XIV Amendment to the U.S. Constitution.

## VENUE

8.     A majority of Defendants' breaches of duty and violations of Montana law enumerated below occurred, directly or indirectly, in Montana.  Pursuant to 28 USCA § 1391(a)(2), venue is proper in this Montana Federal Court where "a substantial part of the events or omissions giving rise to the claim occurred."

## FACTS COMMON TO ALL CLAIMS

9.     In July 2006, Glen Gallier's physicians in Bozeman, Montana, performed a computerized tomography (CT) scan of his abdomen which showed unexplained nodules in his liver.  A needle biopsy on September 18, 2006 showed inflammatory changes in Glen's liver consistent with hepatitis and cirrhosis

without evidence of cancer.

10.    Glen gave a history of Hepatitis C, contracted in the military service, and a past history of alcoholism.

11.    On December 20, 2007, Dr. Annie Castillo saw and evaluated Glen Gallier for the first time.  Dr. Castillo concluded from the literature[1] and Glen's lab work, exam, and CT scans at that time that he had hepatocellular carcinoma and required chemotherapy.

12.    Dr. Castillo decided not to biopsy Glen's liver because the published Guidelines do not require such a biopsy when the alpha-feto protein (AFP) is greater than 200 and the liver nodules are larger than 2 cm.[2]  Glen Gallier's AFP was over 9,000 and his liver nodules were in excess of 3 cm in January 2008.

13.    After obtaining informed consent, on January 17, 2008, Dr. Castillo started an oral chemotherapy agent called Nexavar at a dose level of 400 mg twice daily.  She explained to him that this was not curative therapy and that he was not eligible for a liver transplant or surgical resection of the liver nodules.

14.    Glen had been diagnosed with a disease which he knew was going to kill him.  He was desperate.  He looked at the possibility of treatment in Billings under a study protocol of the National Cancer Institute; but when he saw the polished television ad and website of CTCA and the enthusiastic testimonials of

---

[1] Dr. Castillo references American Association of Study of Liver Disease Guidelines
[2] See http://www.aasld.org/practiceguidelines/Pages/EndStageLiverDiseaseSurgery.aspx

presumably cured cancer patients, together with being told "what he wanted to hear", he was sold on CTCA for the medical services he needed.

15.     Dr. Castillo continued to use Nexavar; however Glen tolerated the drug poorly and doses had to be reduced and treatments delayed.  Nevertheless, Glen's AFP, *the only pure blood borne marker for cancer activity*, precipitously dropped to 846 on January 28, 392 on February 4, and to 50 by March 3, 2008. Further, Glen's physical examination noted his liver margin to have shrunk from 8 cm (>3inches) below his rib margin on his right side to no liver margin felt.

16.     Dr. Castillo struggled with Glen's side effects, adjusting doses and delaying treatments, but continued Nexavar, which seemed to be working dramatically.

17.     On or about March 3, 2008, Mikelle Raffel, the Galliers' daughter, contacted a CTCA Oncology Information Specialist, Jessica Carlson ("Carlson"), through the click to chat option available on CTCA's website.  During that click to chat conversation Carlson instructed the Galliers' daughter in the differences between "cyberknife therapy" and "chemo-embolization" and "theresphere" therapies.   Ms. Carlson indicated that "they" typically  don't use cyberknife therapy.

18.     Carlson followed up with a telephone call to Glenn Gallier where she implied that CTCA was a cure and his "answer."   Through other CTCA

employees, Carlson made the travel arrangements for Gallier to treat at Southwestern.

19.    On March 12, 2008, seeking the amazing results advertised on CTCA's television ads and internet testimonials, Glen Gallier transferred his care to CTCA's Southwestern in Tulsa, Oklahoma.  He was having chemotherapy side effects from the Nexavar and CTCA's advertisements promised him results which sounded almost too good to be true.

20.    On his March 12 visit, Glen Gallier saw CTCA Dr. Leon J. Yoder. Considering Glen's case, including his AFP of 48.5 and his "minimal" liver enlargement at the time, Dr. Yoder opined: *I am not sure of the diagnosis of HCC [hepatocellular carcinoma] since no tissue was ever obtained."  "I feel strongly that he should have a liver biopsy for definite confirmation and then definitive plans can be made for his treatment."*

21.    Two days later, on March 14, 2008, Southwestern's Dr. Simeon Jaggernauth (pictured on the internet as a "CTCA doctor") started chemotherapy with a toxic and expensive regimen which included Gemcitabine, Oxaliplatin, and Neulasta.  Dr. Jaggernauth was at all times relevant hereto acting in the course and scope of his employment in a closed-staff hospital.  Dr. Jaggernauth did not obtain the requested biopsy of the liver because, in his words, "he does not want to undergo this procedure".  No expression of "against medical advice" or informing

Glen of Dr. Yoder's uncertainty of diagnosis is recorded on the medical record. No complications from Glen's 2006 liver biopsy or his refusal of biopsy in March of 2008 are recorded on the medical record. Nexavar was listed under "allergies" for the first time in March 2008.

22.    Dr. Jaggernauth administered a second cycle of chemotherapy on March 28, 2008 in Tulsa. At Glen's request, two subsequent treatments with this regimen were carried out in Bozeman, Montana at the express direction of Southwestern.

23.    In July 2008, Glen sought care with Dr. Thomas Purcell at the Billings Clinic. As a pre-treatment requirement for toxic, experimental therapy, Dr. Purcell ordered the biopsy which Dr. Yoder had urged back in March 2008. On August 5, 2008, three CT-directed needle biopsies of Glen's liver nodules, carried out in Billings, Montana, revealed inflammation and cirrhosis, but *no cancer whatsoever.*

24.    As a result of the chemotherapy given and recommended by Defendants, Glen Gallier has suffered harm in the form of acute and known long-term side effects of the chemotherapy agents, substantial medical costs for un-needed chemotherapy, unwarranted pain and suffering, and emotional distress. His wife Jann has suffered loss of comfort and companionship, as well as emotional distress in her own right, thinking for almost a year her husband was dying from cancer.

## COUNT I – DEVIATION FROM STANDARD OF CARE
### (Against Defendant Southwestern)

25.    Plaintiffs re-allege ¶¶ 1-24 above.

26.    In providing medical care to Glen Gallier, Southwestern, by and through Dr. Jaggernauth and others on their closed medical staff, was negligent, and provided such services below safe and prudent standards of cancer care for health care providers and licensed health care institutions, including without limitation, the following:

a.  Failing to verify cancer in a patient without any other criteria allowing the reasonable assumption of cancer;

b.  Failing to fully and completely evaluate the efficacy of prior chemotherapy before proceeding with toxic, expensive, potentially fatal chemotherapy;

c.  Failing to adequately consider other FDA-approved regimens;

d.  Failing to obtain adequate consent for unproven, off-label, non-protocol-approved therapy; and

e.  Misleading Glen Gallier as to the expected results of treatment.

## CAUSATION

27.    Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-26.

28.    The acts and omissions of Southwestern:

a.  Exposed Glen Gallier to the toxicities, both short and long term, of an

alkylating agent (Oxaliplatin) and an antimetabolite (Gemcitabine);

b.  Deprived Glen Gallier of months of productive life;

c.  To a medical probability, deprived Glen Gallier of his expected years of survival; and

d.  Caused considerable and ongoing mental anguish to the Plaintiffs by creating the unfounded and false understanding that Glen had terminal cancer, though his course was recognized as aberrant by Dr. Yoder and, subsequently, by Dr. Purcell.


## DAMAGES

29.    Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-28.

30.    Plaintiffs have sustained damages from the negligence of Southwestern, without limitation, as follows:

a.  Exorbitant medical bills/costs;

b.  Short and long term toxicity from potentially fatal chemotherapy, given for non-existent cancer;

c.  Mental anguish from the drug toxicity and the unwarranted assumption of continued cancer;

d.  Interruption of an established course of personal and family life;

e.  Loss of spousal consortium;

f.  Wage loss;

g.  Exorbitant medical costs; and

h.  The infliction of emotional distress upon Glen, Jann and all of his family and friends who watched helplessly as he  was given discouraging news about his improved status and was given unnecessary toxic combination chemotherapy.

## COUNT II- UNAUTHORIZED PRACTICE OF MEDICINE
### (Against  Defendant CTCA)

31.    Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-30.

32.    Jessica Carlson, an agent of CTCA (Oncology Information Specialist) and an employee of CTCA with bonus incentives, by holding herself, through her training, branding, and indicia of authority of CTCA, as having the ability to advise Glen Gallier on the effectiveness of certain treatments for his cancer, is engaging in the unauthorized practice of medicine, and in violation of Montana law.  *See* Mont. Code Ann. § 37-3-102(8)

33.    Plaintiffs have suffered and continue to suffer damages as a result of Defendant CTCA's unauthorized practice of medicine, including but not limited to being duped into transferring care to Southwestern to the detriment of Galliers and the profit of CTCA and Southwestern.

34.    Plaintiffs are entitled to recover all damages allowed under Montana law.

SECOND AMENDED COMPLAINT
PAGE 11

## COUNT III-NEGLIGENCE
### (Against All Defendants)

35.  Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-34.

36.  It was the duty of the Defendant CTCA to use due care when directing Glen Gallier to a cancer treatment center thousands of miles away, without any inkling of biopsy-proof of cancer.  CTCA held itself, and its profit center Southwestern,  out, in its marketing and conduct towards Gallier, as being able to "cure" Gallier by putting him in the hands of "it's" experts.  CTCA created a duty to use due care when directing Glen Gallier to a cancer treatment center.

37.  Defendant CTCA breached that duty of due care by promising Glen Gallier that CTCA was his answer, that he would receive a "higher level of care" there, and that his hope of "cure" was at hand.  CTCA directed Glen Gallier to a cancer treatment facility which contractually paid CTCA a fee and that CTCA knew or should have known provided services below safe and prudent standards of cancer care for health care providers and licensed health care institutions.

38.  As a direct and proximate result of the negligence of the Defendant CTCA, Plaintiff has suffered damages set forth herein in an amount to be determined.  All the damages were directly and proximately caused by the aforementioned negligence of the Defendant CTCA in concert with its corporate partner and profit center Southwestern.

## COUNT IV – CONSUMER PROTECTION ACT VIOLATIONS
### (Against all Defendants)

39.   Plaintiffs re-allege, as if set out in its entirety, ¶¶ 1-38.

40.   Plaintiffs were consumers pursuant to the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101 et. seq. at all times relevant hereto.

41.   Defendants engaged in unfair or deceptive acts or practices in the conduct of their commerce or trade through their unfair and deceptive conduct in promising to cure Plaintiff Glen Gallier of cancer he never even had and in charging grossly exorbitant sums for medical treatment which he did not need and/or which is not customary or necessary medical services.  CTCA engaged in further deceptive acts by holding itself out as a healthcare provider and cancer treatment facility when it is, by its own admission, neither.

42.   Plaintiffs have suffered and continue to suffer damages as a result of Defendants' unfair and deceptive acts and conduct.

43.   Plaintiffs are entitled to recover all compensatory and actual damages (including, but not limited to emotional distress damages), as well as treble damages, costs and attorney's fees as provided by the Montana Consumer Protection Act.

WHEREFORE, having stated a claim for relief, Plaintiffs request the following remedies and relief:

1.   For judgment in Plaintiffs' favor.

2.      Interest on sums awarded.

3.      For cost of suit as allowed by law.

4.      For any and all compensatory damages.

5.      For any and all penalties imposed by law, including but not limited to penalties for practicing medicine without a license and treble damages and attorney's fees under the Montana Consumer Protection Act.

6.      For any and all additional relief which may be appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all triable issues.

DATED this _17__th day of November, 2009.

                              HAMMOND LAW FIRM, PLLC

                              HEENAN LAW FIRM


                              By _/s/ Neel Hammond_____
                                   Mandi Gibbs
                                   John Heenan
                                   Neel Hammond


## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify this Pleading contains 2521 words (as counted by Microsoft Word 2007), is double spaced and printed at least 14 point, Times New Roman, except for footnotes.

                              By _/s/ Neel Hammond_____

SECOND AMENDED COMPLAINT
PAGE 14

NEEL HAMMOND